BEFORE THE FIRST DIVISION

SEPTEMBER 12, 1960

**No. 64530.**—Inter Maritime Forwarding Co., Inc. *v.* United States, protest 58/16546 (New York). Plaintiff's motion to admit certain exhibits in evidence denied by order of Chief Judge OLIVER and Judge WILSON; Judge MOLLISON dissenting. The following memorandum accompanied the order denying the motion:

WILSON, Judge: This matter is before us on a motion made by counsel for the plaintiff to have certain exhibits (plaintiff's exhibits 6, 7, and 8 for identification) admitted in evidence. It is contended in support of said motion that said exhibits are relevant in the determination of the proper rate of duty applicable to the involved woolen fabrics. Although we are not now concerned with the final decision of the case, yet in order to put the proposed exhibits in the proper setting, it is necessary to refer to the plaintiff's claims in the case and the evidence already in the record.

The merchandise involved herein consists of certain woolen fabrics "entered for consumption at the port of New York, N.Y., after 4:07 p.m. Eastern Daylight Saving Time, July 25, 1957, and before August 13, 1957." The imported goods were assessed by the collector at 45 per centum ad valorem, plus 37½ cents per pound. Paragraphs 1108 and 1109(a) of the Tariff Act of 1930 were modified under the provisions of the General Agreement on Tariffs and Trade, T.D. 51802, so as to reduce the tariff rate on woolen fabrics of the kind provided for under paragraph 1109(a) to 37½ cents per pound and 25 per centum ad valorem.

However, the so-called Geneva reservation to the General Agreement on Tariffs and Trade reads as follows:

NOTE: The United States reserves the right to increase the ad valorem part of the rate applicable to any of the fabrics provided for in item 1108 or 1109(a) of this Part to 45 per centum ad valorem on any of such fabrics which are entered in any calendar year in excess of an aggregate quantity by weight of 5 per centum of the average annual production of similar fabrics in the United States during the 3 immediately preceding calendar years.

In accordance with the foregoing reservation, the President of the United States, on May 24, 1957, notified the Secretary of the Treasury that for the calendar year 1957 the quota of foreign woolen fabrics of the type now under consideration would be 14 million pounds. Thereafter, under date of June 12, the United States Bureau of Customs sent out Circular Letter No. 2986, which was in effect on the date of the importations in question. This letter advised the collectors of customs of the United States that "As soon as preliminary information indicates that the quota is filled, telegraphic notice to that effect will be issued. Final instructions on the duty status of all entries and withdrawals will be issued upon receipt of complete reports from all collectors." Under date of July 23, 1957, a telegram was sent to each of the collectors of customs advising them that "Preliminary information indicates wool fabric quota may fill July 24. Effective opening business July 24 and pending further notification follow procedure BCL 2986 of June 12." Another telegram, dated July 25, 1957, directed to all collectors of customs, conveyed the information that "Preliminary reports indicate wool fabric quota filled close business July 25. Effective opening business July 26 require deposit higher ad valorem duty all entries and withdrawals per BCL 2986." On December 3, 1957, a letter from the Bureau of Customs notified the collector of customs at New York that the 1957 "quota on woolen and worsted fabrics was filled on July 25, 1957, at 3:07 p.m., e.s.t." Copies of all the messages sent by the Bureau of Customs to the collectors at the various ports are attached to a stipulation filed herein on March 7, 1960. Said attached documents are marked exhibits 1, 2, 3, and 4.

It has been stipulated between the parties that a certain document, dated May 28, 1957, issued by the Committee for Reciprocity Information, marked exhibit 5, already in evidence, "is an official government document issued by the Committee for Reciprocity Information." Exhibit 5 sets forth the United States production of the types of woolen fabrics that would be dutiable, if imported, under paragraphs 1108 and 1109(a), for the years 1954 through 1956, which were the 3 years preceding the year in which the plaintiff's goods were imported and entered. The average domestic production for these 3 years was used in fixing a quota for the year 1957.

Counsel for plaintiff contends, in his argument, that the figures used by the President for the years 1954, 1955, and 1956 as a basis for fixing the quota of goods to be imported at the reduced rate for 1957 were inaccurate, and that the President, therefore, was without authority to base the quota of foreign goods to be admitted upon those figures. Evidently, for the purpose of substantiating the claim that the figures used by the President were inaccurate, the plaintiff has offered exhibits 6, 7, and 8 marked for identification. Plaintiff's exhibit 6 for identification, a document issued by the Committee for Reciprocity Information, contains a table setting forth the domestic production figures of woolen fabrics for the years 1953, 1954, and 1955, used by the President in determining the foreign quota to be admitted at the reduced rate for the year 1956. Plaintiff's exhibit 7 for identification, issued by the same committee, has a table attached setting forth the figures used by the President covering domestic production of the type of goods in question for the years 1955, 1956, and 1957 as the basis for

fixing the quota for 1958. Plaintiff's exhibit 8 for identification sets forth certain figures taken from "Reports No. FT 110—Bureau of the Census" covering the importation of woven woolen fabrics of the type in question for the months of May, June, July, and August 1957. There is no information in the document covering importations for the first 4 months of the year.

The crux of the issue here is, are the exhibits in question (plaintiff's exhibits 6, 7, and 8 for identification) admissible for the purpose of proving or attempting to prove that the figures used by the President, as set forth by plaintiff's exhibit 5 now in evidence, are unreliable and untrustworthy to the point of making invalid the Presidential finding of the amount of the domestic production of woven wool fabrics for the year 1957 and thereby establishing a basis for the quota of foreign goods to be admitted at the lower rate?

There is no question but that the figures set forth in plaintiff's exhibit 5 were used as the basis for the President's finding of the amount of domestic production for 1957 and in fixing the quota under attack. Neither is there any question but that there is some difference between the figures set forth in proposed exhibit 6 for the years of 1954 and 1955, and the figures for the same years contained in plaintiff's exhibit 5. The same is true of the figures used in exhibit 7 for the years 1955 and 1956 and those set forth in plaintiff's exhibit 5. However, it is obvious from an examination of all three tables (plaintiff's exhibit 5 now in evidence, and plaintiff's exhibits 6 and 7 marked for identification) that certain information in all of them was based upon estimates. It is also evident that the same type of information was used and that the same methods were followed in compiling all three tables, that is, certain parts of the information were based on estimates and the amount set forth in pounds in each table was computed by converting yard measurements to pounds. The court can see no value, therefore, in considering the figures used in determining the quotas for 1956 and 1958 for the purpose of discrediting the figures used for 1957. How can any more reliability be placed upon the tables contained in plaintiff's exhibits 6 and 7 for identification than attaches to the figures in plaintiff's exhibit 5? Looking at the situation as a whole it would appear that the best information obtainable was used in compiling the figures used in plaintiff's exhibit 5. In any event, that information could not be made to appear more or less accurate by receiving in evidence the proposed tables used in determining quotas for entirely different years. The court is, therefore, of the opinion that plaintiff's exhibits 6 and 7 for identification are inadmissible, and the defendant's objection to the admission of such documents is sustained.

Plaintiff's exhibit 8 for identification we think is also objectionable. The figures used in the exhibit cover only the second 4 months of the year 1957. This offer was obviously made upon the theory that the quota regulation did not become effective until May 1957. However, as pointed out by defendant, paragraph 7(b) of Presidential proclamation 3160, issued September 28, 1956, T.D. 54212, reads as follows:

(b) following December 31, 1956, until otherwise proclaimed by the President, if such fabrics are entered, or withdrawn from warehouse, for consumption in any calendar year after that total aggregate quantity by weight of such fabrics which shall have been notified by the President to the Secretary of the Treasury, and published in the FEDERAL REGISTER, has been so entered or withdrawn during such calendar year; which quantity the President shall have found to be not less than 5 per centum of the average annual production in the United States during the three immediately preceding calendar years of fabrics similar to such fabrics; * * *.

It seems clear, therefore, that the determination of the quota should be on a calendar-year basis, beginning, in this instance, on January 1, 1957. Otherwise,

the whole situation would be filled with utter confusion, since there is no assurance that the quota would be fixed or determined on the same date each year. The proposed exhibit does not contain information that could assist the court in determining the issues involved in the final determination of the case, since exhibit 8 for identification is incomplete and not based upon a proper construction of the proclamation covering quotas. The objection to the admission of said exhibit 8 for identification is, therefore, sustained.

For the reasons stated aforesaid, plaintiff's motion herein to admit exhibits 6, 7, and 8 for identification in evidence is denied.

Order will issue accordingly.

### DISSENTING OPINION

MOLLISON, Judge: I disagree with my colleagues in denying admission into evidence of plaintiff's exhibits 6, 7, and 8 for identification.

Exhibit 6 for identification concerns production statistics used in the determination of the 1956 tariff quota on wool fabrics provided for in paragraphs 1108 and 1109(a). Said exhibit 6 for identification is a photostatic copy of the original issued by the Committee for Reciprocity Information and has attached thereto Table 1—United States Production of the Types of Woven Wool Fabrics that would be dutiable, if imported, under tariff paragraphs 1108 and 1109(a), 1953–55, and Table 2—Woolen and Worsted Woven Fabrics Containing 25 percent or more Wool by Weight: United States Production, by Specified Classifications, and Average Weight per Linear Yard, 1947.

Exhibit 7 for identification, notwithstanding that it concerns production statistics used in the determination of the 1958 tariff quota and woolen and worsted fabrics dutiable under tariff paragraphs 1108 and 1109(a), nevertheless, gives statistics of domestic production of specified woolen and worsted fabrics for the years 1955, 1956, and 1957, in linear yards as reported by the Bureau of the Census and on an equivalent weight basis. Exhibit 7 for identification states that the average annual production in 1955–57 was 281.5 million pounds. The exhibit likewise states that the corresponding average for the 3 years 1954–56 was 277 million pounds. Exhibit 7 for identification also states that the revision of Bureau of the Census statistics for 1955 and 1956 has resulted in a number of changes in the figures given in the release of the Committee for Reciprocity Information of May 28, 1957, pertaining to the 1957 tariff quota. Exhibit 7 for identification is admittedly a copy of an official public document executed and/or issued by the Committee for Reciprocity Information. Said exhibit 7 for identification further stated that the figures of domestic production were obtained by converting statistics on linear yards of woolen and worsted fabrics to *pounds* for the purpose of determining total domestic production on a *weight basis* and that these same conversion factors were used for each of the 3 years 1955–57.

Exhibit 8 for identification is a compilation of figures concerning wool fabric imports in pounds for the year 1957, which were extracted from Reports No. FT 110 of the Bureau of the Census. It was admitted by defendant's attorney that the figures contained therein for woven wool fabric imports in pounds and the total figures therein in respect to the amounts in pounds for the respective months of May, June, July, and August and the aggregate total for the 4 months of 1957 were proper and correct domestic woolen poundage statistics. See Transcript pages 33, 34, 35, 36.

Since the reception in evidence of plaintiff's exhibits 6, 7, and 8 for identification goes to the very heart or core of the issue in dispute, i.e., the validity or legality of the determination of the 1957 tariff quota for woolen and worsted

fabrics, it is essential to set forth the plaintiff's claims on the merits of the controversy in order to see what the issues are in the light of the claims asserted.

Plaintiff contends that (1) the President had no lawful or constitutional right to establish "the Geneva wool fabric reservation" and the quota for woolen and worsted fabrics therein provided for; (2) in order to determine "an aggregate quantity by weight of 5% of the average annual production of similar fabrics in the United States during the three immediately preceding calendar years," the President was required to set up and maintain records to establish such 3-year weight production statistics; (3) the President had no right or authority to violate or depart from or fail to comply with the prerequisite poundage standard which he himself had created; (4) there was no right to assume that the standard established by the President had been reached and the 14 million pounds woolen quota had been exhausted on August 12, 1957, when the plaintiff's woolen or worsted fabrics were imported.

Whether facts are material to any inquiry must be determined by the nature of the right or liability asserted. *Willoughby* v. *Jamison*, 103 F. 2d 821, cert. den., *Jamison* v. *Willoughby*, 308 U.S. 588, 60 S. Ct. 111, 84 L. ed. 492; *David Bradley Mfg. Co.* v. *Eagle Mfg. Co.*, 57 F. 980. Whether the facts, or the things which exhibits 6, 7, and 8 for identification tend to show, are material depends upon whether such facts and things are relevant and go to the substantial matters in dispute or have a legitimate or effective bearing on the decision of the case. *United States* v. *De Lucia*, 256 F. 2d 487, 491, cert. den., 358 U.S. 836, 79 S. Ct. 59, 3 L. ed. 2d. 72; *Lynch* v. *Rosenberger et al.*, 249 P. 682, 683, 121 Kan. 601; *Ismert-Hincke Milling Co.* v. *Mercurio Bros. Spaghetti Mfg. Co.*, Mo. App. 243 S.W. 408, 410; *Prouty Lumber & Box Co.* v. *Cogan et al.*, 200 P. 905, 101 Or. 382; *American Process Co.* v. *Pensaukcn Brick Co.*, 75 A. 976, 78 N.J.L. 658; 31 C.J.S. page 868, section 159, notes 6, 7, 8, 9, and 10.

The parties have entered into a stipulation and by virtue of paragraph (5) thereof, an attached document, dated May 28, 1957, from the Committee for Reciprocity Information entitled "Production Statistics used in Determination of 1957 Tariff Quota on Woolen and Worsted Fabrics Provided for in Paragraphs 1108 and 1109(a)," an official public document issued by the Committee for Reciprocity Information, was received into evidence as exhibit 5.

The following quotation from the aforesaid exhibit 5, relating to the domestic production of woolen and worsted fabrics in the United States and to the method employed in arriving at the 1957 tariff quota, throws light upon the relevancy, materiality, and competency of exhibits 6 and 7 for identification:

Domestic production of woolen and worsted fabrics was reported by the Bureau of the Census, by kinds of products, in linear yards and pounds in 1947 and in linear yards and average weights per linear yard in 1954. *For other recent years, the reported production was in linear yards only.* [Italics added.] Inasmuch as the tariff quota computation must be based on a 3-year average of aggregate domestic production in pounds, it was necessary to convert the linear yard figures, item by item, for each of the years 1954, 1955 and 1956 into equivalent production expressed in pounds. This was done by using as conversion factors the average weights (in ounces) per linear yard as reported in the *Census of Manufactures* for 1954, except that for two items the figures reported for 1947 had to be used. The statistical data used in making these computations and the detailed results are given in table 1, while table 2 shows how the individual conversion factors reported by the Bureau of the Census were used to arrive at the 1954 production figure in pounds for each fabric classification.

The statistics of United States production of woolen and worsted fabrics for the years 1953, 1954 and 1955, which were issued by the Committee for Reciprocity Information on November 1, 1956, were computed with the use of average weights based on data in the 1947 *Census of Manufacturers*, the latest data on

weights available. For present purposes, however, the figures of domestic production by weight have been calculated, as explained above, on the basis principally of the average weights per linear yard as reported in the 1954 *Census of Manufactures*. This recomputation of all 1954 and 1955 production figures in pounds, together with changes in the basic data for some individual items necessitated by revisions reported by the Census Bureau, accounts for the differences between the production figures for 1954 and 1955 herewith presented and those released by the Committee for Reciprocity Information last November.

It appears in exhibit 5 that domestic production of woolen and worsted fabrics was reported by the Bureau of the Census in linear yards and *pounds* in 1947 and in linear yards and average weights for linear yards in 1954. For other recent years, the reported domestic production was in linear yards *only*. Exhibit 5 necessarily implies that the last reported production of woolen and worsted fabrics in *pounds* was in 1947. It shows that certain *conversion* factors were used to arrive at the 1954 production statistics in *pounds* for the woolen and worsted fabrics. Exhibit 5 also shows that the statistics of United States production of woolen and worsted fabrics for the years 1953, 1954, and 1955, issued by the Committee for Reciprocity Information, were *computed* with the use of average weights based on data contained in the Bureau of the Census' *1947* Census of Manufactures, *the latest data on weights available* in respect to woolen and worsted fabrics.

For the purpose of the 1957 tariff quota, exhibit 5 shows that the statistics of domestic production of woolen and worsted fabrics by *weight* have been calculated on the basis principally of the average weights per linear yard as reported in the 1954 Census of Manufactures. Further, "This recomputation of all 1954 and 1955 production figures in *pounds* [italics added], together with *changes* [italics added] in the basic data for some individual items necessitated by revisions reported by the Census Bureau, accounts for the differences between the production figures for 1954 and 1955 herewith presented and those released by the Committee for Reciprocity Information last November."

Plaintiff's attorney contends that the total figures or statistics (i.e., the aggregate quantity by weight of similar fabrics produced in the United States during 3 immediately preceding calendar years) of the United States domestic production of woolen and worsted fabrics mentioned in paragraphs 1108 and 1109 (a) were inaccurate and incorrect, and that the 5 percent, i.e., the resultant 14 million pounds quota figure, is also inaccurate, and, as a consequence, said 14 million pounds was not a lawful quota figure to be applied to the plaintiff's importations. Plaintiff argues that neither the President nor his employees nor designees, nor the Bureau of Customs, nor the customs officials kept records of the *actual* quantities of woolen or worsted fabrics that were imported in 1954, 1955, and 1956. Plaintiff's attorney further contends that the 1957 tariff quota for woolen and worsted fabrics was *computed* on the basis of estimates and the domestic wool production quantities by weight were calculated as a result of conjecture or surmise.

Since exhibit 6 for identification "shows domestic production of specified wool fabrics for the years 1953, 1954 and 1955," the latter 2 years being base years for the 1957 tariff quota, and since exhibit 7 for identification gives "statistics of domestic production of specified woolen and worsted fabrics for the years 1955, 1956, and 1957," the first 2 years being base years for the determination of the 1957 tariff quota, there is a logical or rational connection between the woolen production statistics for the years 1954, 1955, and 1956 as shown by exhibits 6 and 7 for identification and the woolen production statistics shown by exhibit 5 for the years 1954, 1955, and 1956 upon which the 1957 woolen tariff quota was based, and the legality of which tariff quota has been made an issue in this case. Jones, *Evidence*, 5th edition, volume 1, pages 271–272, section

153. The facts offered in evidence by exhibits 6 and 7 for identification have a legitimate tendency to establish the truth concerning the controverted issue, that is, the correctness or accuracy of the domestic production of woolens and worsteds for the years 1954, 1955, and 1956, and the legality of the 1957 tariff quota based thereon. *Cf.* Jones, *Evidence*, 5th edition, volume 1, pages 273–276, section 154.

Objection has been made by defendant's attorney to exhibit 7 for identification because it concerned the tariff quota for woolen and worsted fabrics for the year 1958, presumably because of remoteness in point of time. However, remoteness in point of time does not necessarily render evidence irrelevant,[1] especially, as here, where exhibit 7 for identification includes two of the base years, 1955 and 1956, on which the 1957 tariff quota was based.

Plaintiff's attorney contends also exhibits 6 and 7 for identification are admissible in evidence because they are exactly the same kind of public document as is exhibit 5—issued by the Committee for Reciprocity Information, i.e., production statistics used in the determination of the 1957 tariff quota for wool fabrics— and which show the production statistics used respectively in the determination of the 1956 and 1958 tariff quotas.

Since exhibit 5 concerns the 1957 tariff quota, and since exhibits 6 and 7 for identification relate to the 1956 and 1958 tariff quotas, and since as a whole and separately these three documents deal with the woolen production statistics for the years 1954, 1955, and 1956 or at least of one or more of said base years, exhibits 6 and 7 for identification are connected parts of a whole series of tariff quota documents dealing with the domestic production statistics for the years 1954, 1955, and 1956 and should be received in evidence because the proof has shown their connection and relation. *Warfield* v. *Wire Wheel Corp. of America*, 177 N.Y.S. 733, affirmed 180 N.Y.S. 957; *Sturgis* v. *Baker*, 65 P. 810, 33 Or. 541; 31 C.J.S. *Evidence*, page 917, section 190, note 82; 20 Am. Jur., *Evidence*, sections 274, 275.

Since the defendant has offered exhibit 5 to sustain the tariff quota for the year 1957, consideration should also be given to exhibits, offered by the plaintiff, which challenge the accuracy and truth of the domestic production figures used in determining the 1957 tariff quota for woolen and worsted fabric production, especially where it is shown by exhibits 6 and 7 for identification that the domestic production statistics used in determining the 1957 tariff quota were incorrect and inaccurate. *Cf. Crawford* v. *United States*, 212 U.S. 183, 199, 200, 201, 202, 29 S. Ct. 260, 53 L. ed. 465, 15 Ann. Cas. 392; *Warfield* v. *Wire Wheel Corporation of America*, 177 N.Y.S. 733, affirmed 180 N.Y.S. 957; *Grattan* v. *Metropolitan Life Ins. Co.*, 92 N.Y. 274, 284, 44 Am. R. 372; *Southern Pacific Co.* v. *Stephany*, 255 F. 679; *Sturgis* v. *Baker*, 65 P. 810, 33 Or. 541; 31 C.J.S. *Evidence*, page 917, section 190, note 82; *College Inn Food Products Co.* v. *Loudon Packing Co. et al.*, 65 F. (2d) 883; *National Live Stock Credit Corporation, etc.* v. *Thompson*, 76 F. (2d) 696; Jones, *Evidence*, 5th edition, volume 1, page 352, section 201; 20 Am. Jur., *Evidence*, section 275. Moreover, exhibit 6 for identification on its face purports to explain the methods used in arriving at the figures for the years 1953, 1954, 1955, and 1956; and exhibit 7 for identification *on its face purports to explain errors and revisions* of annual domestic woolen production statistics used in calculating tariff quotas and *changes* in the figures given in the release

---

[1] *Robert Reiner, Inc.* v. *United States*, 15 Cust. Ct. 469, Reap. Dec. 6240, affirmed 17 Cust. Ct. 370, Reap. Dec. 6440, which was affirmed *United States* v. *Robert Reiner, Inc.*, 35 C.C.P.A. (Customs) 50, C.A.D. 370; *United States* v. *L. P. Siebold, Inc.*, 10 Cust. Ct. 624, Reap. Dec. 5874; *Dyas* v. *Southern Pacific Co.*, 73 Pac. 972, 974, 140 Cal. 296; *Bunten* v. *Davis*, 82 N.H. 304, 133 Atl. 16, 45 A.L.R. 1409; Jones, *Evidence*, 5th ed.. vol. 1, p. 273, sec. 153, note 15.

of the Committee for Reciprocity Information of May 28, 1957, pertaining to the 1957 tariff quota. *Cf. Crawford* v. *United States, supra*; *Warfield* v. *Wire Wheel Corporation of America, supra*, affirmed 180 N.Y.S. 957; *Grobelny* v. *W. T. Cowan, Inc.*, 151 F. (2d) 810; *Southern Pacific Co.* v. *Stephany*, 255 F. 679; *Sturgis* v. *Baker, supra*; 31 C.J.S.; *Evidence*, page 917, section 190, note 83; Am. Jur., *Evidence*, section 275.

Fairness and justice dictate that, under the above circumstances, plaintiff's exhibits 6 and 7 for identification should be received in evidence in order to allow plaintiff to prove that the woolen production statistics used to calculate the 1957 woolen quota were incorrect and inaccurate and thus to show that his imported woolen fabrics were entitled to the benefit of the lower trade agreement rate. Refusal to admit plaintiff's exhibits 6 and 7 for identification in evidence is a denial of due process of law and equality of treatment and violates the Fifth Amendment to the Federal Constitution.

The majority opinion deals with the purely evidentiary question of the admissibility of exhibits 6, 7, and 8 for identification *as though the court is now deciding the merits of the case*. The majority opinion states that the crux of the issue here is whether exhibits 6 and 7 for identification offered by plaintiff are "admissible for the purpose of proving or attempting to prove that the figures used by the President, as set forth by exhibit 5 [2] now in evidence, are unreliable and untrustworthy to the point of making invalid the Presidential finding of the amount of the domestic production of woven wool fabrics for the year 1957 and thereby establishing a basis for the quota of foreign goods to be admitted at the lower rate." The statement in the majority opinion indicates that the refusal to admit plaintiff's two exhibits is not based upon the law of evidence but rather upon considerations affecting the decision of the case on the merits. The very statement of what the crux of the issue is embraces the very reason why plaintiff's exhibits 6 and 7 for identification are properly admissible in evidence because said two exhibits tend to prove that the figures used by the President were unreliable or untrustworthy or certainly incorrect or inaccurate and, as a consequence, might furnish no lawful basis for determining the wool fabric quota. If it is true as admitted in the majority opinion that there is some difference between the figures set forth in exhibit 6 for identification for the years 1954 and 1955 and the figures for the same years contained in exhibit 5, and if it is true that there is some difference in figures used in exhibit 7 for identification for the years 1955 and 1956 and those set forth in exhibit 5, then these admitted differences are all the more reason why plaintiff's exhibits 6 and 7 for identification are admissible in evidence *since the court is not now considering the merits of the case or attempting* to resolve the conflict of evidence between the various exhibits in the case.

The questions posed in the majority opinion as to the reliability of the domestic wool production statistics or figures contained in exhibits 6 and 7 for identification as compared with such statistics or figures contained in exhibit 5 are proper for consideration in deciding the merits of the case but not in deciding whether said exhibits 6 and 7 for identification are *now* admissible in evidence.

In considering the admissibility of exhibits 6 and 7 for identification the majority opinion overlooks the fact that said two proffered exhibits are official public documents issued by the Committee for Reciprocity Information and containing, respectively, production statistics for the years 1953, 1954, and 1955, and for the years 1955, 1956, and 1957, each proffered exhibit containing, respectively,

---

[2] Erroneously referred to as *plaintiff's* exhibit 5, but admitted in evidence as exhibit 5 by *stipulation*, and presumably offered as much by defendant as by plaintiff since it supplies the domestic production statistics on which the President determined the 1957 woolen tariff quota.

woolen production statistics for two of the base years, and *together* containing woolen production statistics for 1954, 1955, and 1956 which might have been used in the determination of the tariff quota for woolen fabrics in the year 1957.

Since exhibits 6 and 7 for identification relate to and mention woolen production figures similar to those contained in exhibit 5 and are the same kind of official public documents dealing with wool fabric quotas, and since exhibit 6 for identification implies and exhibit 7 for identification expressly states that there were errors, differences, changes, and discrepancies in the woolen production statistics on which the 1957 tariff quota was based, it would certainly seem that the offered exhibits would be very relevant, pertinent, and material for the purpose of discrediting the woolen production statistics or figures used in determining the 1957 quota, and certainly admissible for the purpose of *explaining* the woolen production statistics contained in exhibit 5. *Cf. Crawford* v. *United States*, 212 U.S. 183, 199, 200, 201, 202; *Warfield* v. *Wire Wheel Corporation of America, supra; Sturgis* v. *Baker, supra; Grobelny* v. *W. T. Cowan, Inc.*, 151 F. (2d) 810; *Southern Pacific Co.* v. *Stephany, supra*; 20 Am. Jur., *Evidence*, section 275; 31 C.J.S. *Evidence*, page 917, section 190, notes 82, 83.

Alternatively, plaintiff claims that the shipment here under protest was imported before the 1957 tariff quota for woolen fabrics was exhausted.[3] The plaintiff claims that the 1957 woolen fabric tariff quota was not "in effect" on January 1, 1957; nor was it "in effect" in February, March, or April of that year; that the President was under no compulsion to set up a quota in 1957 nor proclaim such a quota, nor to determine the amount of the quota; and, in any event, no quota was "in effect" or proclaimed until May 24, 1957, the date when the President determined that there would be a 1957 quota and that the quota would be 14,000,000 pounds. See T.D. 54370, volume 92, Treasury Decisions, page 122.

Plaintiff further contends that General Note No. 4 of schedule XX of the General Agreement on Tariffs and Trade (T.D. 51802) was in effect when the merchandise here involved was entered for consumption, said General Note No. 4 being as follows:

4. If any tariff quota provided for in this Schedule, other than those provided for in items 771, becomes effective after the beginning of a period specified as the quota year, the quantity of the quota product entitled to enter under the quota during the unexpired portion of the quota year shall be the annual quota quantity less $\frac{1}{12}$ thereof for each full calendar month that has expired in such period.

Plaintiff further contends that applying the provisions of General Note No. 4 in reduction of the total quota figure of 14,000,000 pounds there was still available 9,333,333 pounds of the 1957 wool quota on May 1, 1957. The merchandise in question was entered for consumption on August 12, 1957.

Plaintiff contends that exhibit 8 for identification establishes that during the period from May 1, 1957, through August 31, 1957, a total of only 7,792,921 pounds of quota woolen fabric was entered for consumption into the United States, and, as a consequence, the available woolen quota of 9,333,333 pounds for the year 1957 had not been reached on the date of the importation of the plaintiff's merchandise. Plaintiff's exhibit 8 for identification would tend to prove that the available quota was not exhausted on the date when plaintiff's merchandise was imported. It was admitted by defendant's attorney that the figures contained in exhibit 8 for identification for wool fabric imports in pounds and the total figures contained therein in respect to amounts in pounds for the

---

[3] Liquidation upon certain quota merchandise without allowance for the reduction granted by the applicable trade agreement is illegal, where the record discloses that entry was duly made during the period within which the reduced rate was applicable. *Esso Standard Oil Company* v. *United States*, 30 Cust. Ct. 111, C.D. 1506.

respective months of May, June, July, and August and the aggregate total for the 4 months of 1957 were proper and correct domestic woolen poundage statistics. See transcript pages 33, 34, 35, and 36. Exhibit 8 for identification has the capability of properly influencing the result of the trial; said proffered exhibit is, therefore, material and has probative value. *Torrey* v. *Congress Square Hotel Co.*; 145 Me. 234, 75 A. (2d) 451, 456. In view of the admission that the domestic woolen poundage statistics contained in said exhibit for identification were proper and correct, the things which said exhibit 8 for identification tended to show must be carefully considered in order to decide fairly the merits of this case. The woolen production poundage statistics contained in said exhibit 8 for identification were of substantial probative value and weight and ought to be considered in the determination of the issues in the case. *Torrey* v. *Congress Square Hotel Co., supra.*

In a judicial proceeding, as here, a party is entitled to introduce evidence in support of his contentions and claims. *Walker Mining Co.* v. *Industrial Accident Commission et al.*, 95 P. 2d 188, 35 Cal. App. 2d 257; *State* v. *Saw*, 42 N.W. 2d 680, 231 Minn. 1; *Cary* v. *Corporation Commission of Oklahoma*, 9 F. Supp. 709. Plaintiff's exhibits 6, 7, and 8 for identification are relevant and material, are of probative value, and have the capability of properly influencing the result of the trial. It is apparent from the latest proceeding (tr. 41) that plaintiff's exhibits 6, 7, and 8 for identification constitute all the evidence that the plaintiff will now offer to prove its case. The rejection of this relevant and material evidence would be prejudicial [4] to the plaintiff and would in substance and effect deny the plaintiff its day in court and deprive it of due process of law in violation of the Fifth Amendment to the Federal Constitution. *Walker Mining Co.* v. *Industrial Accident Commission et al., supra*; *State* v. *Saw, supra*; *Cary* v. *Corporation Commission of Oklahoma, supra.* In the furtherance of justice, the rule of completeness demands the introduction in evidence of exhibits 6 and 7 for identification, said documents being, respectively, the 1956 and 1958 tariff quota documents for wool fabrics, and containing domestic woolen production statistics, among other things, for the years 1954, 1955, and 1956, and being so related on their face to exhibit 5 that their introduction in evidence is essential for an adequate understanding of exhibit 5. *Warfield* v. *Wire Wheel Corporation of America*, 177 N.Y.S. 733, affirmed 180 N.Y.S. 957; *Sturgis* v. *Baker*, 65 P. 810, 33 Or. 541; *Grattan* v. *Metropolitan Life Ins. Co.*, 92 N.Y. 274, 284, 44 Am. R. 372; Chamberlayne, *Modern Law of Evidence* (1911), volume 1, sections 488, 520, 522, 523.

SEPTEMBER 15, 1960

---

[4] *Nussbaum* v. *Atlas Laundry Co., Inc.*, 10 F. (2d) 353.